# Exhibit A

Floorplan Agreement

# FLOORPLAN CREDIT AND SECURITY AGREEMENT

This FLOORPLAN CREDIT AND SECURITY AGREEMENT (including any addenda, "Agreement") is entered into as of 04/19/2022 between BAV AUTO LLC T/A Costas Auto Gallery with an address of 1829 US HWY 1 Rahway, NJ 07085 , ("Dealer") and Vero Finance Technologies, Inc. dba Lever Auto, together with its successors and assigns ("Lender"). Certain terms with initial capitalization are defined in Section 9.1 hereof.

The parties agree as follows:

1. THE LOANS.

1.1    Floorplan Facility.  Dealer may request advances ("Advances") for the acquisition of specific Vehicles, and Lender, in its sole discretion, may make such Advances.  Lender's right to decline to make any Advance and to suspend Advances generally is a material term of this credit facility and may not be waived, suspended or altered except in a writing signed by it specifically referring to this clause.

1.2    Term Sheet.  Lender shall from time to time provide a summary term sheet ("Term Sheet") containing terms and conditions applicable to the floorplan facility including interest rate, curtailment requirements, vehicle eligibility, advance rates and the like.  Dealer acknowledges a copy of the initially effective Term Sheet.  Lender may update and replace the Term Sheet from time to time by notice to Dealer.  Dealer need not join in an updated Term Sheet for it to be effective.  Except as otherwise provided herein, any change in terms set forth in a new Term Sheet shall be effective 30 days after the issuance thereof unless Dealer requests an Advance during this 30 day period or Dealer, in which case such change(s) shall be effective from the date of issuance

1.3    Advance Requests.  Lender may establish from time to time procedures and requirements for requesting an Advance.  Lender may rely on Advance requests from Dealer's principal, any executive officer, general manager, or any person authorized by any of the foregoing.  Dealer authorizes Lender to permit Approved Auction Houses to request Advances directly, and agrees that any draft by or request for an Advance from an Approved Auction House shall constitute a request by Dealer regardless of the circumstances between Dealer and the Auction House.

1.4    Funding.  Lender may make Advances by credit to a deposit account of Dealer or by other means as Lender may elect.  Lender additionally may elect to fund Advances directly to any vendor, distributor, supplier or auction house of Floored Vehicles.  Lender may offset and apply any portion of an Advance against amounts due to it from Dealer.

1.5    Interest, Charges and Fees.

(a)    Dealer shall pay interest on Advances outstanding from time to time at the rates, at the times, and calculated in the manner determined by Lender from time to time.  Until otherwise provided by Lender, interest shall accrue on each Advance at the rate per annum set forth in the Term Sheet shall be paid upon the sale of the related Floored Vehicle, or if sooner, at the time the last curtailment payment for such Advance is due.  Interest shall be calculated on the basis of actual number of days elapsed in a 360-day year, unless otherwise indicated by Lender.

(b)    Upon the occurrence and during the continuance of an Event of Default, interest shall accrue at a rate per annum equal to the lesser of (i) the aggregate of five percent (5.00%) plus

1

the rate otherwise applicable; or (ii) the maximum interest rate permitted by law, effective immediately on Lender's election.

(c) Dealer shall pay a Subscription Fee monthly on the first day of the month, regardless of floorplan usage, so long as this agreement remains in place.  Payment of the Subscription Fee does not alter the demand, discretionary nature of this facility.

(c) If any payment due hereunder is unpaid for five (5) days or more, Dealer shall pay, in addition to any other sums due hereunder and without limiting Lender's other remedies, a $100.00 late charge.

(d) If pursuant to the terms hereof, Dealer is at any time obligated to pay interest or other amounts on the Advances or any Obligation at a rate in excess of the maximum permitted by applicable law, the interest rate and/or other amounts shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of interest and charges due hereunder or, if required by law, shall be returned to Dealer.

1.6   Floorplan Principal Payments.

(a) All outstanding Advances are payable ON THIRTY (30) DAYS DEMAND prior to an Event of Default, and immediately ON DEMAND after an Event of Default.

(b) Prior to demand, Dealer shall repay Advances on unsold Floored Vehicles ("Curtailment Payments") in the amounts and at the times specified by Lender from time to time in the Term Sheet.

(c) Upon the Sale of a Floored Vehicle, the Advance Balance plus accrued and unpaid interest and charges relating to such Floored Vehicle and the related Advance (the "Payoff Amount") shall be due immediately and prior to the release or delivery, of such.  Nonetheless, Lender may allow Dealer a period of time after a Sale (a "Release Period") to pay such amounts, as may be described on the Term Sheet.  Any Release Period shall not apply to the loss or destruction of a Floored Vehicle.  Any Release Period is subject to change or revocation at any time, on notice to Dealer, and is automatically terminated, without notice, upon the occurrence of an Event of Default.  The full Payoff Amount shall be paid in full regardless of whether the proceeds received by Dealer are in cash or in kind or are less than the Payoff Amount. For purposes of this Section, "Sale" shall mean Dealer's sale, lease, exchange, trade, or any other disposition.

1.7   Floorplan Limit, Overadvances.  From time to time, Lender may establish limits on the maximum outstanding aggregate Advances (any such limit, the "Floorplan Limit"), and if at any time the outstanding aggregate balance of Advances is at or above the Floorplan Limit, Dealer shall not request further Advances.  Lender may make Advances in excess of the Floorplan Limit, in Lender's sole discretion and all such excess Advances shall be "Advances" subject to the terms hereof, provided however, all Advances in excess of the Floorplan Limit shall be payable on demand, without regard to or benefit of the (conditional) ten day period otherwise provided herein.

1.8   Advance Rates, Vehicle Standards.  From time to time, Lender may establish advance rates and standards for Vehicles financed hereunder.  Lender may from time to time change such advance rates and standards, effective immediately upon notice to Dealer by way of a revised Term Sheet or other means.  Without limitation of any other provisions hereof, Lender may condition its funding of Advances on Dealer's delivery to Lender of whatever documents Lender may request

Doc ID: f790adf3752549a5cc5d01ce199f38c71e743b7b

(including certificates of title and/or any documentation evidencing payoff of trade-in liens), in form and detail satisfactory to Lender.

1.9    Payment Process.  All payments due hereunder shall be paid to such account of Lender that Lender may specify from time to time.  Additionally, Dealer shall allow and hereby authorizes Lender to directly withdraw all amounts due hereunder from Dealer's general operating bank account by ACH or other means acceptable to Lender and shall execute such documents and may be required by Lender or its depository bank from time to time.  Dealer shall maintain in such account amounts sufficient to pay all amounts coming due hereunder. Without limitation of other rights, Dealer shall pay Lender $100.00 to compensate Lender for costs associated with any ACH returned for nonsufficient funds or any other reason.

1.10    Outstanding Balances.  Lender's internal records shall constitute presumptive evidence of the outstanding principal balances of all Advances as well as the amount of interest, fees and charges that may be owed to Lender at any time.  Absent manifest error, any statement or invoice sent or made available to Dealer online, through an app or otherwise shall constitute conclusive evidence thereof unless objected to in writing within fourteen (14) days of the date thereof

2. SECURITY

2.1    Grant of Security Interest.  In consideration hereof, Dealer hereby grants to Lender a security interest in, a lien on, and pledge and assignment of all of its now owned and hereafter acquired or created tangible and intangible personal property, to wit:

> All present and future property and rights of Dealer in and to: (a) all inventory, including all new and used motor vehicle, motorcycle, all-terrain vehicle, scooter, power sport vehicle and parts Inventory, and further including without limitation, all inventory on order, but not yet delivered to Dealer, and all consigned goods, and all motor vehicles and other goods held for short or long term rental or lease and for use as so-called demonstrator vehicle and service loaner/shop rental vehicle; (b) all accounts, contract rights, chattel paper, electronic chattel paper, instruments, documents, promissory notes, and supporting obligations; and all rights and benefits under any agreement for an interest rate swap, forward rate, cap, floor, or collar, or the like, to the full extent assignable; (c) all payment intangibles and all rights to receive payment, credits, and other compensation; (d) all general intangibles, books, records, files, computer disks, software, involving or emanating from Dealer's business or assets; (e) all investment property; (f) all payments and credits and accounts that Lender may owe to Dealer, and all funds of Dealer that Lender may have or retain in its possession, whether in the form of cash collateral, reserve, contingency, escrow accounts to the extent of Dealer's interest, deposit accounts, operating accounts, or otherwise; (g) all deposit and other accounts in and with all other banks and depositories; (h) all equipment, including without limitation, all furniture, machinery, tools; (i) all fixtures; and (j) all additions, substitutions, replacements, accessories, attachments and accessions to, and all proceeds of the foregoing and of proceeds, including all motor vehicles, motorcycles and other goods received in trade, claims, and tort recoveries, insurance proceeds, refunds of insurance premiums, proceeds derived from Dealer's sale or assignment of chattel paper, and all cash and other funds held in all deposit

3

      accounts in which proceeds may be deposited (all of the foregoing, the "<u>Collateral</u>").

The security interest granted by this Agreement is given to and shall be held by Lender as security for the payment and performance of all Obligations, including, without limitation, all amounts due under any guaranty previously, concurrently, or hereafter executed by Dealer, and shall continue even if at any time there shall be no amounts outstanding, until payment and performance of all Obligations or until terminated in a writing signed by an authorized officer of Lender.

2.2    <u>Perfection</u>.  Dealer authorizes Lender to file UCC financing statements and take whatever additional actions Lender deems appropriate to perfect and continue perfection of Lender's security interest all at Dealer's expense and ratifies any prior filing or action.  The UCC filing may indicate "all assets" as collateral.  Without limitation of the generality of the foregoing, upon the request of Lender, Dealer shall provide to Lender control agreements and take such other action as Lender may request to perfect Lender's security interest and give Lender control (as defined in the Code) in deposit accounts constituting Collateral.

2.3    <u>Motor Vehicle Titles</u>.  Without limiting the generality of Sections 1.3 and 2.2, at any time, with or without cause, unless Lender waives in writing, Dealer shall deliver to Lender, or to Lender's designee, the original certificate of title or registration with respect to each Floored Vehicle and, after any Default, on Lender's request, to each other vehicle in inventory that has not been specifically financed by another third party lender.  Lender may retain physical possession of such certificates until such time as the particular Vehicle has been sold in the Ordinary Course of Business, and except to the extent that a Release Period applies, Dealer has paid to Lender the Payoff Amount with respect thereto or, if an Event of Default shall have occurred, regardless of whether the Vehicle is a Floored Vehicle, the greater of the Payoff Amount or the entirety of the proceeds of the sale thereof. If required by law or at Lender's request, Dealer shall facilitate Lender's possession of titles at Dealer's premises.

2.4    <u>First Priority Security Interest</u>.  Lender shall at all times have a first priority security interest in all Floored Vehicles and the proceeds thereof.

2.5    <u>Motor Vehicle Inventory Runs</u>.  Dealer shall deliver to Lender, immediately on request of Lender, a complete and current list of all Vehicle Inventory, identifying each Vehicle in inventory or owned by it, including non-Floored Vehicles, its location, its mileage, whether it is subject to any trade-in or other lien, the date of Dealer's acquisition thereof, the price paid therefor, and whether Dealer holds clear title.

2.6    <u>Use of Vehicles</u>.  Dealer will not use any Floored Vehicle for any purposes other than offering for sale or lease and preparing to sell or lease. Without limitation, Dealer will not permit any Floored Vehicle to be used as a management demo, courtesy vehicle or loaner car.  Dealer will not register, license, or title any Floored Vehicle except upon sale in the ordinary course of business.

2.7    <u>Sales of Floored Vehicles</u>.  Dealer shall not, without Lender's prior written consent, sell, lease, assign, transfer, or grant any type of security interest in or with respect to any Floored Vehicle or in any retail paper arising from the sale thereof, <u>provided</u> <u>however</u>, so long as no Event of Default exists, and subject to the terms, conditions and payments required hereby:

4

(i) Dealer may sell or lease Floored Vehicles to bona fide third party purchasers and lessees in the Ordinary Course of Business from its premises or other premises that have approved in writing by Lender, for fair market value.

(ii) Dealer may sell chattel paper that constitutes proceeds of the sale of a Floored Vehicle under clause (i) to finance companies for new value money in the Ordinary Course of Business, so long as such amounts are paid to Lender in accordance with the terms hereof.

(iii) Dealer may sell Vehicles at recognized auctions or at wholesale in accordance with its customary practices so long as Dealer gives Lender prior written notice of its intent to auction or wholesale Floored Vehicles that constitute 20% or more in number of its then Floored Vehicles.

2.8    Notice of Assignment.  At any time after demand or if Lender believes that a Default may have occurred, without notice to Dealer, Lender may notify any or all Dealer's account debtors and other payment obligors (including auction houses and buyers of chattel paper) of the security interest granted to Lender hereby, and direct such person(s) to make payment of amounts on which Lender has a security interest, including directly to Lender.  Dealer unconditionally and irrevocably authorizes and instructs each of its account debtors and payment obligors to make payment directly to Lender or as instructed by Lender.  Lender may collect such payments and apply such amounts to the then outstanding Advances in such manner as Lender determines appropriate.

2.9    Collateral Proceeds; Trust.  Dealer shall promptly pay-over and deliver Lender all proceeds, less any amounts that may be retained by Dealer as provided in the last sentence of this Section, derived from the sale or lease of Floored Vehicles or the sale of Chattel Paper that is proceeds thereof, or in any way derived from any other Collateral.  Upon the sale or lease of a Floored Vehicle in whole or partial consideration for a (trade-in) vehicle from the buyer or lessee, then, except to the extent that Lender agrees to make an Advance with respect to such trade-in, Dealer shall promptly pay to Lender an additional amount equal to the trade-in allowance or credit granted to such buyer or lessee, which amount shall represent substitute Collateral proceeds.  At any time, with or without cause, Lender may require that Dealer pay-over and deliver to Lender, proceeds in the form received, including third-party checks received by Dealer in connection with sales of Inventory, or arising out of sales of chattel paper.  In any event, any proceeds received by Dealer, whether in the form of checks, drafts, credit card drafts, or otherwise shall be the property of Lender, and at all times while Dealer may hold such proceeds, Dealer shall do so "in trust" for and on behalf of Lender.  Dealer and Lender intend and agree that there shall be a true trust relationship between Dealer and Lender, with Dealer assuming full fiduciary duties, responsibilities, and obligations to and in favor of Lender.  Provided however, so long as no Event of Default has occurred, Dealer may retain for working capital the excess of: (i) the proceeds received from the sale, lease or other disposition of a Floored Vehicle, over (ii) the Payoff Amount with respect thereto.

2.10    Power of Attorney.  Dealer shall execute such Powers of Attorney empowering Lender to deal with vehicle titles and such other matters relating hereto as Lender may request.

2.12    Landlord's Acknowledgment.  Dealer shall obtain from any person having an ownership interest in all premises at which it operates an acknowledgement and consent to the security interest provided here and acknowledging Lender's right to remove Vehicle Collateral, and a subordination

5

of any interest it may have in Floored Vehicles. Dealer properly identified its Landlord in the Application.

2.13     Representative. At any time, with notice to Dealer if prior to Default, Lender may designate a representative to take one or more of the following actions: (a) to enter any locations where Dealer conducts business or maintains collateral, and to remain on premises for such time as Lender may deem desirable; (b) to take possession and control over certificates of title and keys with respect to each Vehicle comprising part of Dealer's inventory; (c) to take constructive or actual possession over all documents, books, records (including electronic records), papers, accounts, chattel paper, electronic chattel paper, instruments, promissory notes, general intangibles, payment intangibles, supporting obligations, contract rights, software or any similar types of tangible or intangible property relating to or comprising part of the Collateral; (d) to receive payment of all Collateral proceeds; and/or (e) to take whatever additional actions Lender may deem necessary or desirable to protect and preserve the Collateral, and to carry out, and to protect and preserve Lender's security rights and remedies. The representative need not be independent, and may be an officer or employee, of Lender. The representative shall have no fiduciary duty or obligation to Dealer or to any other person other than Lender. Dealer shall fully cooperate with the representative and shall provide the representative with such offices and other facilities on Dealer's Premises as Lender may reasonably request. After any Default, Dealer shall pay the reasonable fees of the representative (including charges for Lender employees). Lender's appointment of a representative shall not impair or in any way prejudice the rights of Lender to exercise any of its rights and remedies otherwise available.

2.14     Guaranties. The payment and performance of all Obligations shall be unconditionally guaranteed at all times by those persons and entities identified from time to time by Lender, including, initially, the persons and entities listed on the Initial Terms Schedule. Lender, on thirty days notice, for any reason, may require additional guarantors. All guarantees shall be pursuant to guaranty agreements acceptable to Lender.

### 3. REPRESENTATIONS AND WARRANTIES

3.1     Organization and Qualification. Dealer is a duly organized entity of the type and in the state described in the Application, and is in good standing in all states where relevant. Dealer's exact name is as set for the in the preamble to this Agreement. Any prior names of Dealer are set forth in the Application.

3.2     Licenses and Dealership Agreements. Dealer holds all state and local licenses necessary to sell and service used Vehicles, in the manner now conducted by it and as is usual and customary of other Vehicle dealers in the state and city or town of its location.

3.3     Places of Business. All Floored Vehicles shall be kept at the location noted in the preamble hereof and the other locations, if any, listed on the Application, except that Dealer may move Floored Vehicles to auction lots in connection with the sale thereof in the usual course of Dealer's business so long as Dealer gives Lender prior written notice of the movement of Floored Vehicles that constitute 20% or more in number of its then Floored Vehicles.

3.4     Valid Obligations. The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary corporate or other action and each represents a legal, valid and binding obligation of Dealer and is fully enforceable according to its terms, except as limited by laws relating to the enforcement of creditors' rights.

6

3.5    No Conflicts.  There is no provision in Dealer's organizational or charter documents, if any, or in any indenture, contract or agreement to which Dealer is a party that prohibits the execution, delivery or performance of the Loan Documents.

3.6    Litigation.  There are no civil or criminal actions, suits, proceedings or counterclaims, or any investigations or demands or claims by any Attorney General or other regulatory authority, pending or to the knowledge of Dealer threatened against Dealer or any Guarantor on the date hereof except as disclosed in the Application, as may be supplemented in writing prior to the date hereof, if any.

3.8    Taxes.  Dealer has filed all Federal, state and other tax returns, including sales tax returns required to be filed (except for such returns for which current and valid extensions have been filed), and all taxes, assessments and other governmental charges due from Dealer or with respect to which Dealer is subject to withholding responsibility, have been fully paid.  Dealer has established on its books reserves adequate for the payment of all Federal, state and other tax liabilities.

3.9    Information.  All financial and other information provided or that will be provided to Lender relating to Dealer and each of its Affiliates is accurate, not misleading, and does not fail to disclose all material facts appropriate for Lender to know Dealer's financial position, business performance, and prospects.  Since the effective date of the most recently delivered financial information as to Dealer, there has been no material adverse change in its financial position, prospects, properties or management.

## 4. AFFIRMATIVE COVENANTS

4.1    Books and Records; Inspection.  Dealer will at all times keep proper books of account in which full, true and correct entries will be made of its transactions in accordance with generally accepted accounting principles, consistently applied.  Dealer will allow Lender continuous electronic access to its bank accounts and books and records through whatever means and applications Lender may request, and at reasonable times will make its physical books and records available for inspection and examination by Lender.  Dealer will permit Lender to inspect the Floored Vehicles and other Collateral at any time, without notice. Dealer shall reimburse Lender for the costs and expenses incurred by Lender in connection with any such access, review and inspections.

4.2    Financial Statements.  Dealer will deliver to Lender financial reports and other information in form acceptable to Lender, as outlined in the Term Sheet.  Dealer also authorizes Lender to communicate directly with Dealer's accountant, and hereby authorizes and requests its accountant to respond to all inquiries and requests from Lender.

4.4    Conduct of Business; Licenses.  Dealer shall maintain its existence in good standing and comply with all applicable federal, state and local laws and regulations including those relating to oil, hazardous materials, environmental, labor and employment, and equal credit opportunity. Dealer will maintain all licenses, franchises, and authorizations that may be necessary or desirable for it to continue its business operations as now and in the future conducted.

4.5    Taxes.  Dealer will promptly pay or fully reserve against all real and personal property taxes, assessments and charges and all franchise, income, unemployment, old age benefits, withholding, sales and other taxes assessed against it or payable by it before delinquent.  Lender may, at its option, from time to time, discharge any taxes, liens or encumbrances on any of the Collateral, and Dealer will pay to Lender on demand all amounts so expended.

7

4.6     Insurance.  Dealer now has and will maintain in force casualty insurance on all Collateral against risks customarily insured against by automobile dealers, containing such terms and written by such companies as may be satisfactory to Lender, such insurance to be payable to Lender as its interest may appear in the event of loss and to name Lender as insured pursuant to a standard loss payee clause; no loss shall be adjusted thereunder without Lender's approval; and all such policies shall provide that they may not be canceled without first giving at least thirty (30) days' written notice of cancellation to Lender.  In the event that Dealer fails to provide evidence of such insurance, Lender may, at is option, secure such insurance and charge the cost thereof to Dealer, and Dealer shall pay to Lender on demand all amounts so paid by it.  At the option of Lender, all insurance proceeds received from any loss or damage to any of the Collateral shall be applied either to the replacement or repair thereof or as a payment on account of the Obligations.  From and after the occurrence of an Event of Default, Lender is authorized to cancel any insurance maintained hereunder and apply any returned or unearned premiums, all of which are hereby assigned to Lender, as a payment on account of the Obligations.  Dealer will immediately notify Lender of (i) any loss of or material damage to any Floored Vehicle, and (ii) any (other) loss or damage to, or material diminution in, or any other occurrence that would adversely affect the value of inventory, or other Collateral, excluding only valuation shrinkage resulting from the mere passage of time or general market conditions.

4.7     Notification of Litigation.  Dealer will promptly notify Lender in writing of (i) any commenced or threatened litigation that involves one or more Floored Vehicles or that claims damages in excess of seventy five thousand dollars ($75,000), or which, if adversely determined, would or might be materially adverse to the financial condition of Dealer and (ii) any investigative proceedings of a governmental agency or authority commenced or threatened against any of them, regardless of apparent scope or magnitude, but excluding routine periodic examinations.  For purposes of this section, any litigation styled as a class action shall be considered to have possible material adverse effect.

## 5. FINANCIAL COVENANTS

5.1     Financial Covenants.  From time to time, Lender may establish financial covenants and performance requirements applicable to Dealer and/or any Guarantor that it deems appropriate in its sole discretion.  Any financial covenants and requirements shall be set forth on the Term Sheet.  All such covenants and requirements shall be deemed a part hereof, breach of which shall constitute an Event of Default.  During any period of time in which any financial covenants are in effect, Dealer shall deliver to Lender compliance certificates in such detail and frequency as Lender may request (quarterly unless Lender has requested otherwise).  Such compliance certificates shall be signed by Dealer's president, chief financial officer, or other representative acceptable to Lender and shall contain Dealer's calculation of ratios and numbers for all financial covenants then in effect.  However, such calculations shall be subject to Lender's review, and all reasonable determinations, exclusions, and adjustments made by Lender shall be conclusive.

## 6. NEGATIVE COVENANTS

6.1     Limitations on Indebtedness.  Except with thirty (30) days written notice to Lender, Dealer shall not borrow or become directly or contingently liable for, or suffer to exist indebtedness other than: (i) indebtedness to Lender, and (ii) indebtedness or liabilities, other than for money borrowed but allowing for ordinary equipment leases and purchase money security interests in equipment other than Vehicles, incurred or arising in the usual course of an automobile dealership business,

(iii) Subordinated Indebtedness to one or more of Dealer's equity owners, or (iv) other floorplan lenders and other Indebtedness to other lender listed on the Application.

"Subordinated Indebtedness" shall mean indebtedness for borrowed money, the borrowing of which shall have been approved by Lender prior to its incurrence, and which has been subordinated by a subordination agreement approved by Lender and executed and delivered by the holder thereof.

6.2    Ownership, Management.  Dealer shall not permit any sale or transfer of ownership of any interest in Dealer without Lender's prior written consent, which consent will not be unreasonably withheld.  Dealer shall give Lender prior or concurrent written notice of any change in its senior management.

6.3    Dividends and Distributions.  After Default, Dealer shall not pay any dividends on or make any distribution on account of any stock or other equity interest or redeem, purchase or otherwise acquire, directly or indirectly, any of such equity, except if Dealer is taxed as an S corporation or as a partnership, under the Internal Revenue Code of the United States, then, so long as no Default would result from such distribution, Dealer may distribute to the stockholders, partners, or members, as applicable, of Dealer such amounts as are necessary to pay the tax liability of such persons arising as a result of Dealer's income.  After Default, Dealer shall not pay any compensation or fee to any shareholder or other Affiliate, except amounts approved in advance and in writing by Lender.

6.5    Merger, Change of Name.  Dealer will not merge or consolidate or be merged or consolidated with or into any other entity without the prior written consent of Lender which consent will not be unreasonably withheld, but may be subject to such review and analysis and to such documentation as Lender determines appropriate.  Dealer shall not change its legal name or the state of its organization, without giving Lender at least thirty (30) days' prior written notice thereof.

## 7. DEFAULT

7.1    Default.  "Event of Default" shall mean the occurrence of one or more of any of the following events:

(i)    Dealer shall fail to timely pay or perform any Advance or other Obligation, hereunder or otherwise.

(ii)    Without limiting the generality of clause (i) above, the failure of Dealer to hold in trust and pay to Lender the proceeds of the sale or lease of any Floored Vehicle in strict accordance with the terms hereof.

(ii)    Breach of any financial covenant established under Section 5.1 hereof

(iv)    Breach of any covenant or agreement herein not covered by clauses (i) (ii) or (iii) that continues for seven (7) days after Dealer's knowledge thereof.

(v)    Default by Dealer or any Guarantor and the passage of any express periods of grace under this Agreement or any other agreement with Lender.

(vi)    Default of any obligation for repayment of money borrowed or any material liability, obligation or undertaking of Dealer or any Guarantor to any person other than Lender, which continues uncured beyond any express grace period.

9

(vii) Any statement, representation or warranty heretofore, now or hereafter made in connection with this Agreement or in any financial statement of Dealer or any Guarantor shall be determined by Lender to have been false in any material respect when made.

(viii) If Dealer or any Guarantor is a corporation, trust, limited liability company or partnership, the liquidation, termination or dissolution of any such organization, or the merger or consolidation of such organization into another entity, or its ceasing to carry on its present business or the appointment of a receiver for its property.

(ix) The death of any individual Guarantor.

(x) The institution by or against Dealer or any Guarantor of any proceedings under the Bankruptcy Code 11 USC §101 *et seq.* or any other law in which Dealer or any Guarantor is alleged to be insolvent or unable to pay its respective debts as they mature, in the case of any such proceedings against Dealer, if not dismissed within sixty (60) days, or the making by Dealer or any Guarantor of an assignment for the benefit of creditors or the granting of a trust mortgage for the benefit of creditors.

(xi) A judgment or judgments for the payment of money shall be rendered against Dealer or Guarantor and any such judgment or shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution.

(xii) Any levy, seizure, attachment, execution or similar process shall be issued or levied on any Collateral.

(xiii) The termination of any guaranty of the Obligations or Lender's receipt of any notice of termination of any such guaranty.

(xiv) Lender shall fail to acquire, or ever cease to maintain, a first priority security interest in all Floored Vehicles and the proceeds thereof including vehicles received in trade.

(xv) The occurrence of such a material change in the condition or affairs (financial or otherwise) of Dealer or any Guarantor or the occurrence of any event or circumstance such that Lender deems that it is insecure or that the prospects for timely or full payment or performance of any of the Obligations have been or may be impaired.

(xvi) Lender shall reasonably believe that any of the Collateral is in danger of material misuse, loss, seizure or confiscation, or other disposition not authorized hereunder.

7.2    <u>Immediate Demand</u>.  If an Event of Default shall occur, at the election of Lender, all Obligations shall become immediately due and payable without notice or demand.  The foregoing provision and this Section 7 do not alter Lender's right to demand payment of the Advances and any other Obligations that may be payable on demand.

Lender is hereby authorized, at its election, after an Event of Default, without any further demand or notice except to such extent as notice may be required by applicable law, to take possession and/or sell or otherwise dispose of all or any of the Collateral at public or private sale; and Lender may also exercise any and all other rights and remedies of a secured party under the Code or which are otherwise accorded to it in equity or at law, all as Lender may determine, and such exercise of rights in compliance with the requirements of law will not be considered adversely to affect the commercial reasonableness of any sale or other disposition of the Collateral.  If notice of a sale or other action by Lender is required by applicable law, unless the Collateral threatens to decline

10

speedily in value or is of a type customarily sold on a recognized market, Dealer agrees that ten (10) days' written notice to Dealer shall be sufficient notice; and that to the extent permitted by law, Lender may bid and purchase at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations and in either case, may credit bid all or any portion of the Obligations.

Any sale (public or private) shall be without warranty and free from any right of redemption, which Dealer shall waive and release after default upon Lender's request therefor, and may be free of any warranties as to the Collateral if Lender shall so decide. No purchaser at any sale (public or private) shall be responsible for the application of the purchase money. Any balance of the net proceeds of sale remaining after paying all Obligations of Dealer to Lender shall be returned to such party as may be legally entitled thereto; and if there is a deficiency, Dealer (and any Guarantors jointly and severally) shall be responsible for the same, with interest. Upon demand by Lender, Dealer shall assemble the Collateral and make it available to Lender at a place designated by Lender that is reasonably convenient to Lender and Dealer.

7.3    Nonexclusive Remedies.  All of Lender's rights and remedies not only under the provisions of this Agreement but also under any other agreement or transaction shall be cumulative and not alternative or exclusive, and may be exercised by Lender at such time or times and in such order of preference as Lender in its sole discretion may determine.

## 8. MISCELLANEOUS

8.1    No Third-Party Beneficiary.  No Approved Auction House or any distributor or supplier or any person (other than Lender and Dealer) may rely on this Agreement or any term or provision hereof.

8.2    Indemnification.  Dealer shall indemnify, defend and hold Lender harmless of and from any claim brought or threatened against Lender by Dealer, any Guarantor, or any other person (as well as from reasonable attorneys' fees and expenses in connection therewith) on account of Lender's relationship with Dealer or any Guarantor (each of which claims may be defended, compromised, settled, or pursued as determined by Lender, with counsel of Lender's choosing, at the expense of Dealer), except for any claim arising out of the gross negligence or willful misconduct of Lender. The within indemnification shall survive payment of the Obligations, and/or any termination, release or discharge executed by Lender in favor of Dealer.

8.3    Costs and Expenses.  Dealer shall pay to Lender any and all costs and expenses (including, without limitation, reasonable attorneys' fees, the allocable cost of Lender's internal legal counsel, and disbursements, court costs, litigation and other expenses) incurred or paid by Lender in establishing, maintaining, protecting, interpreting, amending or enforcing any of Lender's rights or the Obligations, including, without limitation, any and all such costs and expenses incurred or paid by Lender in preparing the Loan Documents, defending Lender's security interest in, title or right to the Collateral or in collecting or attempting to collect or enforcing or attempting to enforce payment of the Obligations. Lender may charge any account of Dealer for all such costs and expenses at any time and may deduct the same from any Advance.

8.4    Counterparts Execution.  This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall constitute but one agreement. An electronic signature

Doc ID: f790adf3752549a5cc5d01ce199f38c71e743b7b

and any signature or other authentication delivered by electronic image shall suffice as an original for all purposes on this Agreement and all other Loan Documents.

8.5     Complete Agreement. This Agreement and the other Loan Documents constitute the entire agreement and understanding between and among the parties hereto relating to the subject matter hereof, and supersedes, all prior proposals, negotiations, agreements and understandings between the parties hereto with respect to such subject matter.

8.6     Binding Effect of Agreement.  This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and shall remain in full force and effect until terminated as to future transactions by written notice from either party to the other party of the termination hereof; provided that any such termination shall not release or affect any Collateral in which Lender already has a security interest or any Obligations incurred or rights accrued hereunder prior to the effective date of such notice (as hereinafter defined) of such termination.  Notwithstanding any such termination, Lender shall have a security interest in all Collateral to secure the payment and performance of Obligations arising after such termination as a result of commitments or undertakings made or entered into by Lender prior to such termination.  Lender may transfer and assign this Agreement and deliver the Collateral to the assignee, who shall thereupon have all of the rights of Lender; and Lender shall then be relieved and discharged of any responsibility or liability with respect to this Agreement and the Collateral.  Dealer may not assign or transfer any of its rights or obligations under this Agreement.  If any provision of this Agreement or the application thereof to any circumstance shall to any extent be held invalid or unenforceable, the remainder of this Agreement and the application thereof to other circumstances shall not be affected thereby.

8.7     No Implied Covenant.  Acknowledging the demand and discretionary nature of the Floorplan Facility, no covenant of good faith and fair dealing shall apply to the lending relationship between Dealer and Lender.

8.8     Amendments and Waivers.  This Agreement may be amended only by a writing signed by the parties.  No delay or omission on the part of Lender in exercising any right hereunder shall operate as a waiver of such right or any other right and waiver of any right or remedy of Lender on any future occasion.

8.9     Notices.  To be effective under this Agreement, notices must be given and shall be effective as follows:

(a)     To Lender: (i) written notice by overnight mail or delivery service, effective on delivery; or (ii) by email, effective on the Business Day after sending, in either case, sent to Lender's address on the Term Sheet.

(b)     To Dealer: (i) written notice by overnight mail or delivery service, effective on delivery; (ii) by email, effective on the Business Day after sending; or (iii) by hand, effective on delivery to any person authorized to request Advances.  Notices to Dealer may be sent to Dealer's address provided in the Application, or such other address that Dealer may designate by Notice or to any address that Lender regularly uses for communications with Dealer.

8.10    Governing Law, Jurisdiction.  Any and all matters in dispute between the parties to this Agreement, whether arising from or relating to the agreement itself, or arising from alleged extra-contractual facts prior to, during, or subsequent to the Agreement, including, without limitation,

fraud, misrepresentation, negligence or any other alleged tort or violation of the contract, shall be governed by, construed, and enforced in accordance with the laws of New York, regardless of the legal theory upon which such matter is asserted. This Agreement has been accepted by Lender at its office in New York, New York, and Advances shall be made and/or approved from such office. Dealer and each Guarantor each consent and submit to the nonexclusive jurisdiction of any Federal or state court sitting in the State of Dealer's principal location, over any suit, action or proceeding arising out of or relating to this Agreement. Each of Dealer and each Guarantor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. Each of Dealer and each Guarantor hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to Dealer's or such Guarantor's address on Lender's records and (ii) by serving the same upon Dealer or such Guarantor in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Dealer or such Guarantor.

8.11    Consent of Lender. Whenever Lender's consent, approval, acceptance, or other action is required under this Agreement or under any Loan Document, except where Lender's decision is expressly stated to be guided by its reasonable judgment or other express standard, Lender's decision whether to so consent, approve, accept, or act will be in the sole and exclusive discretion of Lender, and Lender's decision will be final and conclusive.

8.12    Patriot Act Notice. Lender hereby notifies Dealer that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (October 26, 2001)), Lender is required to obtain, verify and record information that identifies Dealer, which information includes the name and address of Dealer and other information that will allow Lender to identify Dealer in accordance with such Act.

8.13    Limitation of Liability. Dealer's damages under this Agreement and for all other relations between the parties are expressly limited to the actual dollar amount of Dealer's economic or financial loss, and any claim by Dealer for loss of future profits shall be limited to not more than one (1) year from accrual of the claim for such future profits. In no event will the total amount of damages for which Lender is liable exceed an amount equal to the total interest assessed and actually paid on Advances and other Obligations in the twelve (12) month period immediately prior to Dealer's claim. Dealer may not assert a claim, and Lender shall not be liable for, punitive, exemplary, consequential, or incidental damages.

8.18    Notification of Other Parties. Lender may, but is not required to, notify Guarantors, sureties, suppliers, and other third parties of the provisions of this Agreement and Dealer's performance, or failure to perform, pursuant to this Agreement. In the event Dealer or its Affiliate has an inventory credit facility with a lender other than Lender, Dealer irrevocably consents to the disclosure of financial information between Lender and such other lender, and waives any right of privacy or confidentiality as to such information. Dealer directs such other lender to provide such financial information upon Lender's request.

8.19    Further Assurances. Dealer will from time to time execute and deliver to Lender, and take or cause to be taken, all such other or further action as Lender may request in order to effect and

13

confirm or vest more securely in Lender all rights contemplated by this Agreement or to comply with applicable statute or law and to facilitate the collection of the Collateral.

## 9. DEFINITIONS

9.1     Certain Terms.  The following definitions apply under this Agreement, including on the Term Sheet and any subsequent schedule of terms provided by Lender to Dealer.  Such definitions shall also apply to these terms as used in any promissory note or other document that refers to this Agreement, unless any such term is otherwise defined in such document.

"Advance Balance" means the principal amount of an Advance less any Curtailment Payments thereon received by Lender.

"Affiliate" means any person or entity that, directly or indirectly, controls, is controlled by, or is under common control with Dealer, or is Dealer.

"Application" means the Floorplan Application submitted by or on behalf of Dealer requesting floorplan financing from Lender.

"Approved Auction Houses" are those persons or entities in the business of selling or facilitating sale of Vehicles at auction or at wholesale that Lender approved and agreed to directly fund to provide financing for Dealer's purchase of Vehicles.

"Business Day" means any day other than a Saturday, a Sunday, or a day on which national banks in the state of New York are authorized or required to close.

"Code" means the Uniform Commercial Code as enacted in the state of Dealer's principal business operation, as in effect from time to time.

"Collateral" is defined in Section 2.1 hereof.

"Dealer" is defined in the introductory paragraph hereof.

"Event of Default" is defined in Section 7.1 hereof; and "Default" means an Event of Default or any condition or event that, with notice or the passage of time, or both, would constitute an Event of Default.

"Floored Vehicle" means a Vehicle, the purchase of which by Dealer, has been financed in whole or in part by an Advance that remains wholly or partially outstanding, or a Vehicle against which Lender has made a specific Advance that remains wholly or partially outstanding.  A Vehicle taken in trade as whole or partial consideration for the sale or lease of a Floored Vehicle is a Floored Vehicle, unless and until Lender has received in immediately available funds for the full Payoff Amount of the sold or leased Vehicle.

"Floorplan Limit" is defined in Section 1.7 hereof.

"Guarantor" means each and every person and entity now or hereafter guaranteeing the whole or partial payment or collection of any Obligation.

"Inventory" has the meaning provided in the Code and includes both Floored Vehicles and non-Floored Vehicles and other Inventory.

"Lender" is defined in the introductory paragraph hereof.

"Loan Documents" means this Agreement, and each other agreement, guaranty, security

14

agreement, account control agreement, note, and other instruments and documents in any way relating to any Advance or any other relationship between the parties or any other Obligation now existing or hereafter executed, and all amendments, addenda, and replacements thereto.

"Obligations" mean the Advances, and all other present and future indebtedness, obligation and liability that Dealer, any Affiliate of Dealer, or any Guarantor may incur in favor of Lender, whether direct or indirect, absolute or contingent, liquidated or unliquidated, whether as principal obligor or as accommodation party, whether due or to become due, of every nature and kind, in principal, interest, fees, costs, expenses and attorneys' fees, including obligations under interest rate swap agreements and other capital market agreements, under any term note or any line of credit note executed previously, concurrently, or hereafter, and all other indebtedness, obligations, fees, costs and expenses for which Dealer may be responsible under this Agreement and under each Loan Document.

"Ordinary Course of Business" means sales and leases of Vehicle Inventory to individuals and business entities at retail in a transaction otherwise of the sort described in the Code's definition of "Buyer in ordinary course of business."

"Payoff Amount" is defined in section 1.6.

"Prime Rate" means the rate of interest per annum announced from time to time by the Lender as its prime rate, but never less than zero.  Each change in the Prime Rate shall be effective from and including the date the change is announced as being effective.  Lender may announce its Prime Rate by posting on the dealer only portal on its website, by email or other electronic communication, by providing notice on an invoice, or by any other means it deems expedient.  The Prime Rate is merely a reference rate and may not be the Lender's lowest rate to any customer.

"Term Sheet" is defined in section 1.2.  For certainty, any reference to Term Sheet herein means the  means the Term Sheet then in effect at the time in question.

"Vehicle" means any vehicle, including automobiles, trucks, motorcycles, trailers, and motor homes permitted to travel over public ways and subject to titling statutes in the state of Dealer's principal location, and includes titled and untitled vehicles, whether or not registered, vehicle inventory held for sale or lease, for short or long term rental or use, or for use in Dealer's business.

9.2    Additional Definitions; Construction.  All terms not otherwise defined in this Agreement have the meanings provided in the Code.  In this Agreement, singular words include the plural, and the plural words include the singular.

9.3    Non-Business Day Payments.  Any payment under any Loan Document due to Lender on a day other than a Business Day shall be paid the next Business Day.

## 10. JURY TRIAL WAIVER

**10.1    JURY WAIVER.    DEALER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH INDEPENDENT LEGAL COUNSEL, (A) WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN**

15

**CONNECTION WITH THIS AGREEMENT, ALL LOAN DOCUMENTS, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH, AND ANY AND ALL CAUSES OF ACTION IN ANY WAY RELATING TO ANY MATTER BETWEEN THEM WHETHER ARISING FROM OR RELATING TO THE AGREEMENT ITSELF, OR ARISING FROM ALLEGED EXTRA-CONTRACTUAL FACTS PRIOR TO, DURING, OR SUBSEQUENT TO THE AGREEMENT AND REGARDLESS OF THE LEGAL THEORY UPON WHICH SUCH MATTER IS ASSERTED AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. DEALER CERTIFIES THAT NEITHER LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

Dealer and Lender hereby agree to the foregoing Loan and Security Agreement, and acknowledge all consents and waivers, including the JURY TRIAL WAIVER. Dealer specifically acknowledges that Lender may demand payment of the Advances and/or decline to make Advances at any time for any reason or no reason.

Executed as an instrument under seal as of the date first written above.

**VERO FINANCE TECHNOLOGIES, INC.**

By:_____
JOHN MIZZI, duly authorized officer

BAV AUTO LLC T/A Costas Auto Gallery

By:_____
Vivianne C. Antunes           Alexandre J. Dacosta
President                     Vice President
04 / 19 / 2022                04 / 19 / 2022

Signature Page to Loan and Security Agreement